**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

EDWARD OBERWISE,

    Petitioner,

v.                                                                        CASE NO: 8:11-CV-1124-T-30TGW

SECRETARY, DEPARTMENT OF
CORRECTIONS and ATTORNEY
GENERAL, STATE OF FLORIDA,

    Respondent(s).
_____/

## **ORDER**

Edward Oberwise, an inmate in the Florida penal system proceeding *pro se*, brings this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. #1). The Court has considered the petition, Respondents' response (Dkt. #12) and Petitioner's reply (Dkt. #18). Upon review, the Court concludes that the petition should Be Denied.

### **Factual Background**

The factual background is taken from the facts as described in Oberwise's initial brief on direct appeal. Oberwise was charged with five counts of lewd and lascivious battery. There were two victims, 12-year-old Olivia (three counts) and 14-year-old Caitie (two counts). Oberwise waived his right to a jury trial in exchange for a sentencing cap of 20 years imprisonment, followed by a possible term of probation of up to 15 years.

At the bench trial, the two victims and three detectives (Hollis, Bashner, and Raschke) testified for the State. Oberwise, a Child Protective Services employee (Sandra Shulman) who examined Olivia, and a DNA expert (Benjamin Brooks) testified for the defense. The defense was that no sexual activity occurred and the accusations were a fabrication, possibly orchestrated by Olivia's mother.

Oberwise contacted Olivia over the internet and the two began chatting, eventually arranging a meeting. Olivia admitted her online profile said she was 19, but said she told Oberwise she was 12 when they started chatting.

Olivia convinced her friend Caitie to come with her to the meeting. Caitie slept over at Olivia's house and, about 11:30 p.m., the two slipped out through the bedroom window.

The girls walked to a playground, met Oberwise in his car, and got in the back seat. Oberwise drove to a parking lot, parked, and asked "who wants to go first." Olivia got in the front seat, Caitie stayed in the back, and Oberwise climbed into the back seat.

Oberwise performed oral sex on Caitie. The two girls switched places and Olivia performed oral sex on Oberwise. The girls switched places again and Oberwise performed oral sex on Caitie again. They switched again and Oberwise performed oral sex on Olivia and tried to have intercourse with her. He then drove them home.

The next morning, Olivia's mother noticed the screen was off the window, which prompted her to ask her daughter about it. The full story eventually came out and the police were called. The police arranged four controlled and recorded phone calls between Olivia and Oberwise. When CDs of the calls were introduced in evidence, defense counsel said:

> There have been transcripts made of the phone calls. I have listened to them with [Mr. Oberwise] present. They accurately depict the conversations of the phone calls. Rather than the [court] listening to the phone calls I have no objection to the Court having the transcripts.

The transcripts were not introduced into evidence and are not part of the record. The CDs were not played at this time; as discussed below, they were played later, after Oberwise testified.

Detective Raschke testified that, during these calls, Olivia asked Oberwise "if she was still a virgin based on what happened to her," to which he replied "I don't know. I couldn't get it in you ...." Olivia also asked if she "did a good job giving him ... head" and Oberwise said "[i]t was good, yes."

During these calls, Olivia arranged a second meeting. Oberwise was arrested when he arrived at the meeting place. Written directions to the meeting place were found in his car and condoms were found in the center console. He admitted to Detective Raschke that he talked to the girls and met them but he denied any sexual activity. He said he came to the second meeting because he "had loaned them money to buy beer and he wanted to get his money back."

In the defense case, Child Protective Services employee Shulman testified that she examined Olivia but found no evidence of sexual activity; however, she would not necessarily expect to find any, given the nature of the allegations and the time that had passed. Olivia's statements to Shulman about what had occurred were consistent with her trial testimony.

DNA expert Brooks checked Olivia's jacket to see if he could find any DNA evidence. Olivia told the police Oberwise ejaculated in her mouth and she wiped her mouth on her sleeve. Brooks found nothing on the jacket but said that would not be unusual in these circumstances.

In his testimony, Oberwise admitted he chatted with the girls and met them in his car. They were in his car for about five minutes; he denied any sexual contact. The girls wanted him to buy them beer but he refused. Immediately after the girls got out of his car, he noticed $15 in cash he had in the car was missing. He got mad and "called them back right away after leaving." He "got cussed at" by someone with "a heavy accent," apparently Olivia's mother.

As to the taped phone calls, Oberwise admitted telling Olivia she gave "great head." When asked about Olivia's asking "whether she can get pregnant and you said no," Oberwise replied "I said I was thorough [sic]." Counsel asked "why did you say that if the contact never took place"; Oberwise replied:

A: Well, number one we thought the mom was behind it.

THE COURT: Who is we?

[Oberwise]: I was at a friend's house staying for a week. They started talking about all this stuff that supposedly happens so I was agreeing yeah okay, okay.... And the only reason I was making those statements to Olivia is because I thought her mom was behind this whole thing of meet these guys and take their wallet or take whatever because the profile said ... It was somebody with a heavy accent that was there every night....

Q: So your explanation for those statements --

A: I was pissed.

On cross-examination, Oberwise said he met the girls because "they said they were 19 ... and they asked me ... when I wanted to meet them and I said ... I got to go to a friend's house ... between like 11 or 11:30 so we made plans that night." When the girls got in his car he realized they were underage. He asked them "who is the other girl ... with the heavy accent" and

they told him "that's ... my friend at first and then I was like what's going on." The girls asked him for beer money, he told them no and, after 3-4 minutes, he told them he had to leave and they got out of his car.

As he started to drive away, "a car hit the brake lights and somebody yelled out the window ... and gave me the arm." He did not know if this person was "affiliated with these two girls" but the "only person I knew had a white jeep was them two." He "called [the girls] right away" and asked "who is this girl that just screamed something out of the window" and the girls "started laughing and stuff" and said they did not know. "[T]hen some girl took the phone and talked with a heavy accent" and said "you know who this is and they are like I am her mom ha, ha, ha."

He told this heavy-accent female "they took some money from me and she was like ... just think of it as borrowed." He said "[y]ou just sent your daughters out to rob me ... and then the argument started." He did not call the police about the $15 because "[h]ow am I going to explain to the police it is late at night [and] I got robbed by two 12-year-olds."

The State then asked him about the statements in the recorded phone calls. Oberwise admitted: 1) Olivia asked him "did we have sex" and he said no; and 2) Olivia said "it felt like a little weird" and asked if she was "still a virgin" and he replied "I don't know." He explained this as "[w]e thought her mom was putting her up to asking these questions and we were pissed off at the time." He admitted: 1) he said he could not "get [his] penis in her"; and 2) Olivia asked him if she gave "good head" and he told her she was "great." He said he "wasn't happy what I said but I said it." He admitted telling Olivia she could not get pregnant because he had

a vasectomy; he said that because prior to that they were laughing at my friend for having a vasectomy and I said "What's the big deal?" And they said "It's like having a gun with no bullets." And I said "I got snipped too, but I am not sterile."  He also told Olivia "if I would have come ... I just have a habit of pulling out anyway."

Oberwise admitted they arranged a second meeting at the park.  He explained this conversation as follows:

> A:  Well, she was like let me meet you at the park. So I was at my friend's house and I had it on speaker phone and I said "You know, what's going on?" They're like "Meet me at the park." And I said "Where are we going?" She was like "I don't know." ... I said "Where is your house at?" And she wouldn't tell me. She's like "Just pick me up" .... She hung up. Well, ... half an hour went by and she is like "Where you at?" I said "I'm here." She's like "Well hurry up" [and] she hung up again.... I was at a friend's house and we didn't know if we were going to get set up for a fight or whatever. I had issues with this woman with a heavy accent. I said at the end of the phone call "I am bringing a friend." And I didn't hear anything in the background like fuck you .... That's what I was trying to get out of the phone call.
>
> She acted like she didn't care. So I actually had ... some friends of mine ... that was going to come by like two minutes after I got in the park just in case there was trouble.
>
> Q:  So you thought she was having you come over there to fight somebody?
>
> A:  Like the first night all of a sudden the threats started.

When he got to the park he was arrested; condoms were found in his car.  After his arrest he lied to Detective Raschke "about the whole beer money thing" because "I didn't want to say I got ripped off by two 12-year-olds."

The court noted that Oberwise had stipulated that the transcripts of the phone calls were accurate and asked whether some conversations had been left out of the transcripts.  Oberwise

replied "I don't think they are complete"; "the detective left out things" that he and Olivia said during these recorded calls.

The court finished its questioning and said "I want to listen to the tape." A CD of one of the four recorded calls was played; in it, Olivia is giving Oberwise directions to the meeting place. When this finished playing, the court said "So far I haven't heard anything that's on these transcripts. I heard what appears to be the intercepted telephone conversation number four." The next CD to be played contained the post-arrest interview with Oberwise; the court said "[t]his is not what I'm looking for.... I am interested in intercepted telephone conversation number[s] two and ... three."

The proceeding then moved into the court's chambers (although it is not clear from the record why this occurred). The court noted counsel for both sides were present and the two requested taped conversations were about to be played. Conversation number two was played. In it, Oberwise and Olivia talked about Olivia's problems in school and her concerns about getting in trouble with her mother. This is the call in which Olivia asked about still being a virgin and about "giving good head," and Oberwise told her about his vasectomy and assured her she did fine.

After this CD finished playing, the court asked defense counsel if he was "waiving your client's presence for this"; counsel replied: "Yes, Your Honor. He said he was okay sitting out in the courtroom." The CD of the third conversation was played; in it, Oberwise and Olivia talked about meeting again. The following occurred after it finished playing:

    THE COURT:    Okay. Do you have any other recordings?

MR. DURAN [the State]: I have the other phone calls.

MR. FUTERMAN [defense counsel]: You didn't want to hear the other phone calls, did you, Judge?

THE COURT: I want to hear everything he said because he said there were things he said that were not in the transcripts.

MR. FUTERMAN: I know what he is referring to. He ... is not talking about the validity of these cassettes. He is talking about calls that were not recorded. He believes there were more ... controlled phone calls that have not been taped.

THE COURT: Okay. That's what he believes, not the veracity of those statements.

MR. DURAN: I can get Detective Raschke on the phone.

THE COURT: He is telling me what his client thinks.... [T]hat's attorneys and the judge talking. He has already made his point there were things said that were not on the tape. That concludes the hearing in chambers.

(Proceedings in chambers were concluded)

THE COURT: ... For the record I listened to the tapes which correspond to the intercepted telephone conversation number two and three... [T]hose were heard in chambers. In the courtroom I heard ... number four and we agreed there was no need for me to listen to number one or the ... statement that was made by [Mr. Oberwise] so I did not listen to those.

The trial court never asked Oberwise directly if he agreed to waive his presence for the in-chambers CD playing. But neither Oberwise nor his counsel objected to the court listening to CDs two and three outside the presence of the defendant.

At the beginning of the sentencing, Oberwise addressed the court and said:

I would just like the Court to know that I would like you to reconsider your sentence [sic]. My girlfriend is here. My employer is here. My mom is here. My mom may not got too much longer in this world. That's basically what I got to

say. I got a son to support. You heard the court. You were the main judge that heard and all five felonies. That's all I got to say.

THE COURT: Are you sure that's all you got to say?

[DEFENDANT]: That's all I got to say.

THE COURT: Okay. Anything further?

Olivia's mother testified about the effects this had on her daughter and the court heard a letter written by the fourteen year old victim Caitie. After a discussion about the scoresheet and similar matters, the court said to defense counsel "[y]our client wants you to say something else, sir. It is up to you all." After the State briefly addressed the scoresheet again, the following occurred:

> MR. FUTERMAN: I think Mr. Oberwise wants to make one final comment. I can tell by the Court's questioning earlier that I know the Court was looking for that and I think that Mr. Oberwise wants to express one additional comment.
>
> THE COURT: Since I prompted him.
>
> MR. FUTERMAN: There is some appellate issues that he was concerned with.
>
> THE DEFENDANT: I just need to say to the Court how sorry I am. That's basically it. I got a family. I got a kid.
>
> THE COURT: You know what, sir, you might have thought about that before you tried to pull this off. Don't give me any answers. I am now talking to you. You are what, 40?
>
> . . .
>
> THE COURT: And these young ladies were ... 12 and 14 years old. Now, admittedly they had no business climbing out the window and doing what they did but that's ... no excuse for what you did. The law doesn't recognize that as a defense. You come in here today and all you tell me today be sorry for me because I got a wife, a mother, a child. It is too late. You came all the way from Pinellas County to Lithia.... You went there prowling looking for something,

predator[] is the word ... and you got what you wanted. The problem is you got caught. I think you are sorry but I think you are sorry you got caught. I don't have any sympathy for you. You have messed up one life maybe two over here [i.e., the two victims].... I gave you a chance this morning to say everything you wanted to say. Until you got prompted by me you never even uttered any remorse or say you are sorry.

THE DEFENDANT: This is the first time I have been to court.

THE COURT: Does that mean you are not old enough to realize what you did was wrong and you are sorry for it because you haven't been to court for it? Do you expect me to be stupid enough to believe that? Aren't you a manager at a Publix grocery store?

THE DEFENDANT: Yes, sir.

THE COURT: You got brains. You can't be stupid and do that. The first time you been to court is the only reason you can't say I'm sorry and apologize for what you did? Please, you are insulting my intelligence. I don't want to hear anything. I have heard enough. You can't rehabilitate yourself with me now. I sat here and gave you a chance to say everything you wanted to say and not once did I ever see you look at these people or look at me and say I reflected on this. I am so ashamed and sorry for what I did. I don't think I will ever get over it. I will never forgive myself. I didn't hear a word like that.

THE DEFENDANT: Sorry.

THE COURT: Yeah you're sorry.... You're sorry you didn't think to do it. You are not sorry that you didn't do it because you really didn't mean it. You are sorry because you got caught.

The State supplemented these facts with several statements, only one of which needs repeating: the guideline scoresheet called for a term of 27.1375 to 75 years of imprisonment. The trial court sentenced Oberwise to a total sentence of 20 years imprisonment followed by 10 years of probation: four concurrent terms of fifteen years imprisonment and a consecutive term of five years imprisonment followed by ten years probation.

## **Procedural Background**

Following his sentencing, Oberwise filed a direct appeal raising the following two claims:

(1) Fundamental Error Occurred in this Bench Trial When the Trial Court Heard Evidence in Chambers Without Appellant Being Present and Without Ensuring That Appellant Personally Waived His Presence.

(2) Fundamental Error Occurred When the Trial Court Considered What it Perceived to Be Appellant's Lack of Remorse When Fashioning the Sentence.

The appellate court *per curiam* affirmed the trial court's conviction and sentence. *Oberwise v. State*, 57 So. 3d 857 (Fla. 2d DCA 2011), *review dismissed*, 63 So. 3d 750 (Fla. 2011). Oberwise filed a motion for rehearing and rehearing en banc arguing that the affirmance was in conflict with other Florida case law as to issue two. And Oberwise filed a petition for writ of habeas corpus with the appellate court arguing that his appellate counsel was ineffective for failing to advance any argument as to issue one in the motion for rehearing. The appellate court denied relief. *Oberwise v. State*, 61 So. 3d 1126 (Fla. 2d DCA 2011), *review dismissed*, *Oberwise v. State*, 2011 WL 2462477 (Fla. 2011).

Oberwise then sought discretionary review with the Florida Supreme Court as to both issues raised on direct appeal arguing that the *per curiam* affirmance by the Second District was in conflict with other established Florida case law. The Florida Supreme Court dismissed the petition for lack of jurisdiction. *Oberwise v. State*, 63 So. 3d 750 (Fla. 2011).

Next, Oberwise filed an emergency motion for relief/petition for writ of habeas corpus with the Florida Supreme Court arguing issue one from his direct appeal. The Florida

Supreme Court transferred the case to the Circuit Court of Hillsborough County for the trial court's consideration. By the time Florida Supreme Court transferred the case to Hillsborough County, Oberwise had already filed an emergency motion for writ of habeas corpus with the Circuit Court in Hillsborough County with the same two arguments advanced on direct appeal.

On May 20, 2011, Oberwise timely filed the instant petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. At that time his post-conviction motion was pending in the state court and had not yet been ruled upon. Thereafter, on August 24, 2011, the state post-conviction court denied all of the pending motions because both issues were appropriate for direct appeal, not for collateral attack by post-conviction motion.

In his habeas corpus petition with this Court, Oberwise raises the following two claims (the same two claims he raised on direct appeal in state court):

**Ground One:** Fundamental error occurred in the bench trial when the trial court heard evidence in chambers without my presence; and

**Ground Two:** The trial court improperly increased my sentence because of its perception that I lacked remorse.

## Standard of Review

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), effective as of April 24, 1996, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws of the United States." 28 U.S.C. § 2254(a). The Supreme Court has

cautioned that § 2254 does not make federal courts "forums in which to relitigate state trials." *Barefoot v. Estelle*, 463 U.S. 880, 887, 103 S. Ct. 3383, 77 L.Ed.2d 1090 (1983).

Where a state court initially considers the issues raised in the petition and enters a decision on the merits, Section 2254(d) governs the review of those claims. *See Penry v. Johnson*, 532 U.S. 782, 792, 121 S. Ct. 1910, 150 L.Ed.2d 9 (2001). A federal court may grant a § 2254 petition only if (1) the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) the state decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). *See Price v. Vincent,* 538 U.S. 634, 638, 123 S. Ct. 1848, 155 L.Ed.2d 877 (2003); *Maharaj v. Sec'y for the Dep't of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005).

The Eleventh Circuit Court of Appeals discussed the meaning of the "contrary to" and "unreasonable application" clauses in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Id.*

Section 2254 establishes a highly deferential standard for reviewing state court judgments. *Parker v. Sec'y for the Dep't of Corr.*, 331 F.3d 764, 768 (11th Cir. 2003). If a federal court concludes that a state court applied federal law incorrectly, it may grant habeas relief only if that application was "objectively unreasonable." *Id. See also Yarborough v.*

*Gentry*, 540 U.S. 1, 124 S. Ct. 1, 4, 157 L.Ed.2d 1 (2003). Moreover, under Section 2254(e)(1), a state court's factual findings shall be presumed correct, and the habeas petitioner can rebut the presumption of correctness only by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

## Discussion

**<u>Ground One:</u>**   Fundamental error occurred in the bench trial when the trial court heard evidence in chambers without my presence.

In support of ground one, Oberwise argues:

> A defendant has a right to be present at all critical stages of his trial. He did not waive his right to be present, nor did he ratify counsel's waiver. No waiver ever appeared on record. Without such a waiver or ratification, it was error for the court to hear this evidence without Appellant being present. Since this is a personal right of the defendant, an express waiver is necessary. And it is what's required in this context. The defendant was left out in the courtroom while the judge listen [sic] to evidence in chambers.

Petition (Dkt. #1), p. 6. This ground is procedurally barred. Were it not procedurally barred, it would fail on the merits.

Neither Oberwise nor his counsel objected to the trial court's listening to the CDs in chambers without Oberwise being present. To the contrary, counsel assured the judge Oberwise was "okay" with it. When the trial court judge returned to the courtroom and announced that he had listened to CDs two and three, neither Oberwise nor his counsel objected. A claim is procedurally barred if there is no objection in the trial court. It cannot be raised for the first time on direct appeal. *Creed v. Department of Corrections*, 330 Fed.

Appx. 771 (11th Cir. 2009). When the issue was raised on appeal, the state argued that the claim was procedurally barred.

The state appellate court's *per curiam* affirmance on direct appeal operates as an acceptance of the procedural bar. Where a claim is rejected without opinion, and the existence of procedural bar is clear, federal courts on habeas review will not assume that the state appellate court would have reached the merits of the claim rather than rejecting it as being procedurally barred. *Id.* at 772. Because it is procedurally barred, ground one is due to be dismissed.

By way of explanation to Oberwise why this claim would have failed on the merits even had it survived the procedural bar, the Court will discuss the merits. First, defense counsel waived the presence of Oberwise during the court's listening to the two CDs in chambers without Oberwise being present. Counsel may make this waiver if, subsequent to the waiver, a defendant ratifies the waiver either through examination by the trial judge, or by acquiescence to the waiver with actual or constructive knowledge of the waiver. *Amazon v. State*, 487 So. 2d 8, 11 (Fla. 1986). Here, the court placed on the record that he had listened to the two CDs in chambers without Oberwise being present. Neither Oberwise nor his counsel objected. Silence is sufficient to indicate acquiescence to the waiver. *Id.* at 11. Further, defense counsel made an affirmative representation to the court that Oberwise was aware of the court listening to the tapes and he was "okay" with it.

Had Oberwise not waived his presence, it would have been harmless error for the court to listen to the recordings because he had already been given the transcripts of the conversations. And Oberwise had stipulated to the accuracy of the transcripts.

Oberwise now contends that some of his statement were missing from the tapes in an effort to avoid harmless error. But his counsel clarified for the court on the record that, what Oberwise meant by that, was there were other phone calls that were not recorded, not that the recordings given to the court with the stipulated transcripts omitted any portion of the conversations.

For these reasons, ground one lacks merit.

**Ground Two:** The trial court improperly increased my sentence because of its perception that I lacked remorse.

In support of ground two, Oberwise argues:

Appellant's failure to demonstrate at sentencing what the court believed to be proper remorse. After Appellant's brief statement the court pointedly asked: "Are you sure that's all you've got to say?" Counsel said I can tell by the court's earlier questioning that I know what the court was looking for; the court replied "since I prompted him." The court scolded and said I gave you the whole morning to say everything you wanted to say and not once did you say I am sorry for what I did.

Petition (Dkt. #1), p. 8.

Again, Oberwise failed to object at the trial court level to what he now claims is a vindictive sentence. This would have been a procedural bar, but the state failed to make that argument when the issue was raised on direct appeal. Therefore, even though the appellate

court rejected the claim without an opinion, a federal court on habeas review will not consider the claim procedurally barred. *Harris v. Reed*, 489 U.S. 255, 262 (1989).

Ground two fails on the merits. A habeas petitioner claiming judicial vindictiveness has the burden of demonstrating that such vindictiveness existed. *Alabama v. Smith*, 490 U.S. 794 (1989). It is not sufficient that a defendant make the conclusory claim that he received a sentence higher than what he perhaps expected. Here, while Oberwise received a sentence at the top of the range stipulated to by the state, the sentence was seven years below the actual guideline range of 27.1375 to 75 years imprisonment.

While Oberwise is correct that remorse may be used to reduce, but not increase, a sentence, he has not shown from the record any direct evidence that the trial court increased his sentence because he failed to express remorse. Simply put, Oberwise has not factually demonstrated that the trial judge intentionally set out to punish him for his lack of remorse. Where a trial judge who heard the evidence gives a sentence that is within his range of discretion, it is incumbent upon a habeas petitioner to demonstrate how vindictiveness is evident in the sentence, and Oberwise has failed to do so. *Creed v. Department of Corrections*, 330 Fed. Appx. 771 (11th Cir. 2009).

For these reasons, ground two lacks merit.

## **Conclusion**

The Court concludes that ground one is due to be dismissed as procedurally barred and ground two denied for lack of merit.

It is therefore ORDERED AND ADJUDGED that:

court rejected the claim without an opinion, a federal court on habeas review will not consider the claim procedurally barred. *Harris v. Reed*, 489 U.S. 255, 262 (1989).

Ground two fails on the merits. A habeas petitioner claiming judicial vindictiveness has the burden of demonstrating that such vindictiveness existed. *Alabama v. Smith*, 490 U.S. 794 (1989). It is not sufficient that a defendant make the conclusory claim that he received a sentence higher than what he perhaps expected. Here, while Oberwise received a sentence at the top of the range stipulated to by the state, the sentence was seven years below the actual guideline range of 27.1375 to 75 years imprisonment.

While Oberwise is correct that remorse may be used to reduce, but not increase, a sentence, he has not shown from the record any direct evidence that the trial court increased his sentence because he failed to express remorse. Simply put, Oberwise has not factually demonstrated that the trial judge intentionally set out to punish him for his lack of remorse. Where a trial judge who heard the evidence gives a sentence that is within his range of discretion, it is incumbent upon a habeas petitioner to demonstrate how vindictiveness is evident in the sentence, and Oberwise has failed to do so. *Creed v. Department of Corrections*, 330 Fed. Appx. 771 (11th Cir. 2009).

For these reasons, ground two lacks merit.

## **Conclusion**

The Court concludes that ground one is due to be dismissed as procedurally barred and ground two denied for lack of merit.

It is therefore ORDERED AND ADJUDGED that:

1. Ground one of the petition for writ of habeas corpus is DISMISSED.

2. Ground two of the petition for writ of habeas corpus is DENIED for lack of merit.

3. The Clerk is directed to enter judgment in favor of Respondents and against the Petitioner, terminate any pending motions, and close this file.

CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). Id. "A [COA] may issue...only if the applicant has made a substantial showing of the denial of a constitutional right." Id. at § 2253(c)(2). To make such a showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

**DONE** and **ORDERED** in Tampa, Florida on February 17, 2012.

/s/ James S. Moody, Jr.
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies Furnished To**:
Counsel/Parties of Record

*F:\Docs\2011\11-cv-1124.deny 2254.wpd*